Darr, Senior District Judge,
sitting by designation, delivered the opinion of the court:
The plaintiff calls on this court for an award of damages against the defendant resulting from breaches of a contract which provided for the construction of a flood protection channel in the City of Los Angeles, California.
The facts, as found below, are well summarized in the defendant’s brief and this summation, with some additions and omissions, will be used.
The Soil Conservation Service (SCS) entered into a cooperative agreement with the Los Angeles Flood Control District (District) for the paving of a flood control channel 7,600 feet long following, in general, Bull Creek in San Fernando Valley, California. The District was to provide all rights of way, the SCS was to contract for and supervise construction.
The channel traversed three streets, and certain utilities, (the water mains insofar as this action is concerned) were imbedded in the existing bridge structures. These bridges were to be removed and replaced, and during construction the utilities were to be relocated in earth detours. The Department of Water and Power of the City of Los Angeles (DWP) owned the water mains and it was, of course, necessary to make relocations before new bridge construction could get underway.
The contract for channel paving and bridge construction was awarded to plaintiff in June 1955, and the plaintiff promptly commenced work, since it was obligated to complete by December 10, 1955. The plaintiff considered it feasible and less expensive to begin work on the removal and replacement of the bridges, which necessitated immediate removal of the utilities. The removal of the utilities was delayed, the work not starting until August 9, and plaintiff’s contract period was extended forty-four (44) days by reason of this delay. The relocation work was finished by *75 August 25, and thereafter plaintiff had no further interruptions until October 3, at which time a Teamsters strike began and continued until January 1, 1956. By reason of the Teamsters strike, the plaintiff was prevented from securing aggregates for its concrete, and this virtually shut down the job. Because of this delay, plaintiff received a seventy-one (71) day extension of time.
Under ordinary circumstances, fall rains in the San Fernando Yalley came about the middle of October, however, in 1955, the first fall rain occurred about November 14, to the extent of 0.94 of an inch, causing damage to the slopes which were about 95% excavated. In order to expedite the work, the defendant agreed on December 13, 1955 (during the strike period), to underwrite plaintiff’s additional expenses in securing aggregates from sources not affected by the Teamsters strike, and thereafter plaintiff’s work proceeded without interruption.
On January 25,1956, a storm broke which lasted three (3) days and deposited over six (6) inches of rain in the area, with severe damage to the unpaved channel. Plaintiff completed the job in April 1956, without further incident, and within the contract period, as extended.
By this suit plaintiff seeks to recover the cost of repairing flood damage. Plaintiff contends that the utility delay in July and August was a breach of contract and pushed the plaintiff’s work into wet weather. The plaintiff also contends that the defendant by change order switched at one location from catch basins to spillways, that this change contributed to the damage caused by excessive rains, and that the Government is liable because the revised design was defective.
The plaintiff makes certain other relatively minimal claims that will be later considered.
Whether there was an obligation upon the Government to remove and replace the utilities depends upon the construction of the contract and the interpretation of a letter written to plaintiff by the defendant’s Project Engineer dated June 8, 1955. The pertinent part of the contract is:
“. . . all utilities will be relocated, altered, or reconstructed by the respective owners. The Government *76 will conduct or arrange for such negotiations with the owners in respect to such work and the work will be done at no cost to the Contractor.”
Pertinent portions of the letter are that,
“Previous arrangements have been made_with the owners of subsurface utilities which interfere with the construction at the job sites. These utility owners are currently completing their plans for those relocations. The respective owners should be ready to make the necessary relocations by the time your construction in the detour fills has progressed to the point which will permit installation of the temporary pipelines.”
The purport of the provisions in the contract and in the letter are clear and unambiguous.
In the contract the Government agrees to conduct or arrange for negotiations with the owners for the removal and relocation of the utilities; nothing more, nothing less. The letter informed the defendant that the result of negotiations with the owners was that the owners had made arrangements and plans to remove the pipelines in time to prevent interference with plaintiff’s work. The Project Engineer did not inform the plaintiff that the pipelines would be removed, but that the owners “should be ready to make the necessary relocations”, etc.
No one could err in determining the meaning of the contract. The utility owners were to remove and relocate the water system without cost to the plaintiff. The Government did “conduct or arrange” for such negotiations with the owners. Obviously at the time of the making of the contract the parties did not anticipate trouble with the removal of the utilities. The whole program was for the benefit of the City of Los Angeles and the City of Los Angeles was the owner of the utilities. It could not have been foreseen that a beneficiary would hinder or delay the consummation of a benefaction.
The letter of June 8, 1955, simply tells the plaintiff that the defendant is carrying out its part of the bargain by what appeared to be successful negotiations concerning the removal and relocation of the utilities.
Further evidence in the case indicates that the Government continued to be diligent in trying to have the pipe *77 lines removed and in fact Mr. Maxwell admits that the Government made all effort to do so.
The Government was not responsible for the delay resulting from the failure to timely remove and relocate the utilities. The plaintiff’s suit fails upon this claim.
The original design at all street approaches to the bridge sites called for the installation of catch basins. However, Devonshire Street was a State highway and the cost of such betterments had to be paid for by the State of California. The State wanted less expensive drainage, and required the construction of spillways in place of catch basins. This change was ordered by defendant in July 1955, without protest by plaintiff. The change order was not executed until January 1956. The spillways not having been built until after the damage complained of occurred, whether insufficient or not, could not have caused the damage.
However, plaintiff argues that if the arrangements had been by catch basins, in the normal course of work these would have been constructed when the rains came and the damage avoided. The unforeseen results caused by the heavy rains was a fortuitious happening for which the defendant cannot be penalized.
The plaintiff claims delay by reason of error made by the Government’s surveyors in placing work-guiding stakes. The proof is quite indefinite as to the length of delay and as to any damages resulting therefrom. Actually the record discloses that plaintiff is not making a claim for this error.
Another wrong claimed by the plaintiff is that defendant refused to allow plaintiff to build temporary bridges and to remove the earth detours, as requested in November 1955. This request came when the Teamsters strike was on and the progress of the work greatly impaired. Both parties were making vigorous effort to forward the work. To this end, the defendant undertook to pay plaintiff for extra cost incurred in securing aggregates and to pay for double shifts. The request to build temporary bridges and to remove earth detours was in the nature of a suggestion *78 by wbicb the work might go forward, but in view of other arrangements, the suggestion was mutually abandoned.
The plaintiff further claims a negligent act by the defendant in failing to issue a stop order when the rains came and defer resumption of work until April 1956. It is clear, however, that in the public interest the defendant was justified in declining this request and no wrong can be charged for this action.
Doubtless the plaintiff lost money on this venture, but the fault seems to lie in the failure of DWP in removing the utilities after promising to do so, the Teamsters strike, the extraordinary heavy floods and some want of diligence on the part of the plaintiff.
The defendant did not directly breach the contract nor was the contract impliedly breached by reason of defendant’s negligence.
The petition will be dismissed.
It is so ordered.
Dueeee, Judge; Laramore, Judge; WhitakeR, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff contractor sues to recover losses sustained by itself and its subcontractor and/or joint venturer in the construction of a flood channel project in California consisting essentially of a channel with three bridges over it. The plaintiff contends that the defendant’s delay in removing interfering utility installations at the worksite for 44 days at the commencement of the job threw the contract into the rainy season and not only cost the plaintiff the normal expenses attending delay but also expenses incident to extensive flood damage to the incomplete project. The plaintiff also contends that the defendant’s substantial design change in the drainage system at one of the three bridges augmented the storm damage because the substitute drainage was of inadequate capacity. The defendant contends that, had the *79 plaintiff been diligent and been willing to adopt an alternate construction sequence the delay in removing the utilities would not have prevented the project from being immune to storm damage at the outset of the rainy season, and that furthermore the plaintiff was delayed by two strikes which were not the defendant’s responsibility. These are the principal contentions. Subordinate claims will be specified in the following findings.
2. Plaintiff is a copartnership composed of W. F. Maxwell, a citizen and resident of the State of California, and W. F. Maxwell, Inc., a California corporation.
3. On April 19, 1955, the Soil Conservation Service of the Department of Agriculture (hereinafter referred to as “SCS”) and the Los Angeles County Flood Control District (hereinafter referred to as “District”) entered into a contract whereby it was agreed that SCS would engage in the construction of a flood control channel along Bull Creek in San Fernando Valley, California. The costs of the channel improvement were to be shared equally by the District and SCS, but the District was to pay the entire cost of the bridges, and was to be responsible for furnishing the rights-of-way, including utility relocations. Upon acquisition of the rights-of-way by the District, SCS was to proceed as contracting party and award a contract to the lowest responsible bidder.
4. The contemplated flood control project, known as Bull Creek No. 3, consisted of the construction of a channel approximately 7,600 feet in length and 9 feet in depth following the general north to south flow of Bull Creek. The slopes of the channel were to be lined with 3 inches of asphaltic concrete reinforced with wire mesh, and the bottom of the channel with a gravel blanket topped by 6 inches of reinforced concrete invert. There were in existence 3 street crossings of the creek, one by a paved road dip at Lassen Street, one by a concrete box culvert at Devonshire Street, and one by a timber and concrete bridge at Chatsworth Street, not including a small farm bridge made of timber crossing the creek at a point between Devonshire and Chatsworth Streets. The bridge, culvert, and road dip crossings were to be removed and replaced with new bridges and road approaches. The 3 streets intersecting Bull Creek were, from north to *80 south, Chatsworth, Devonshire and Lassen. The proposed channel project started 2,180 feet below Lassen Street and ended 95 feet above Chatsworth Street. The channel extended 2,630 feet between Lassen and Devonshire Streets, and 2,681 feet between Devonshire and Chatsworth Streets. The Granada channel entered the Bull Creek channel from the west at a point 674 feet above the southern end of the project, and the contract called for improvements in the Granada channel as well. The 3 new bridges were to be of concrete slab type supported by concrete piles. Storm drains and catch basins were to be installed at the intersections of the streets with the channel, designed so as to conduct drainage water from inlet points flush with the street through pipes emptying out onto the concrete invert by going through rather than over the side slopes. The storm drains and catch basins were to be constructed on property belonging to the City of Los Angeles, and the City had the responsibility of designing and paying for such betterments, except that Devonshire Street was a State highway and the costs of the storm drains and catch basins at Devonshire Street were to be the financial responsibility of the State.
5. On June 2, 1955, the plaintiff submitted a bid to the defendant for the project in suit. The bid was in the amount of $383,407.70 and was the lowest of the 9 bids submitted. Plaintiff’s bid was $26,390.60 less than the estimate made by the defendant’s engineers, $35,547.90 less than the next lowest bid, $94,221.91 lower than the highest bid, and $57,856.54 less than the average of the other 8 bids. There is no contention made by the defendant that the plaintiff’s loss is attributable to its negligence in bidding too low, or that the plaintiff’s bid was not based on a reasonable estimate of costs and profit.
6. On June 16,1955, plaintiff entered into a contract with the defendant, acting through SCS, for the construction of the channel improvements heretofore described. The contract provided that the contractor would commence operations within 30 calendar days after date of receipt of notice to proceed, and complete the job within 165 calendar days of receipt of notice to proceed. The contract price was $383,- *81 407.70. Notice to proceed was issued June 28,1955, and the contract completion date was thus set for December 10,1955.
7. Operating engineers’ strike. The plaintiff through his excavation subcontractor had started work on June 20,1955, 8 days prior to the official notice to proceed. From June 24 to July 6 the Operating Engineers Union was out on strike throughout California, and the job was closed down from June 28 through July 1 on this account. In response to plaintiff’s request the defendant issued Change Order 3 which read in part:
* * * Some minor work was resumed on July 5, 1955; however, full-scale operations could not be resumed until 8: 00 A.M. July 6, 1955, after the strike was officially ended and equipment operators again became available. No other operations could efficiently be undertaken during the interim period since at this stage of construction all operations necessitated preparatory work such as clearing and earthwork requiring a crew of equipment operators. Since formal notice to proceed was received by the Contractor at 4:45 p.m., June 28, 1955, the strike resulted in an actual delay to the work from June 29, 1955 thru July 5, 1955, or a total of seven (7) calendar days.
The plaintiff signed his acceptance of the foregoing change order. Three of the 7 calendar days included in the extension were non-working days in any event, because of an intervening weekend and July 4 (Monday) holiday. Four working days can be considered to have been lost due to the strike.
8. Delay in removing utilities. The contract required the removal of a bridge, a box culvert, and a paved road dip, all crossing Bull Creek at 3 street intersections as described in finding 4, supra, and their replacement by 3 concrete bridges. At these locations water mains belonging to the Department of Water and Power of the City of Los Angeles (hereinafter referred to as “DWP”) crossed the channel and, since they were imbedded in or affixed to the existing street crossing installations, their removal was prerequisite to an efficient demolition of the existing bridge, culvert and road dip, and hence to the construction of 3 new bridges under the contract. Since the water service could not be interrupted pending the completion of new bridges, it was planned *82 that road detours be built across the channel and that the water mains be temporarily relocated on the detours until completion of the bridges would permit their reinstallation underneath the bridges. The detours in question consisted in each case of a compacted fill dam in the channel, pierced by pipes at the bottom of the channel so as to allow water to drain down the channel while the detours were in place. Traffic was to be rerouted across the detours during construction of the new bridges.
9. The provisions of the Standard Specifications accompanying the contract relative to removal of utilities provided as follows:
2.1 RIGHTS-OF-WAY AND RIGHT OF ACCESS:
(a) General.
Bights-of-way and/or easements have been secured for work sites, disposal areas, and for such trails and roadways as deemed necessary for ingress and egress to the work site(s). The right to enter, remove, alter or make use of any adjacent property, roads, utility lines, fences and improvements not included within the above rights-of-way shall be the sole responsibility of the contractor.
Where the right of ingress and egress is not defined in the easement, the Government Bepresentative will designate the right-of-way to be used.
In case of serious interference to the work by delay of the Government hi arranging for permanent rights-of-way or permanent or temporary easements, as delineated on the plans and/or drawings, within the areas bounded by rights-of-way lines or detour boundaries the Contractor will be allowed an extension of time equivalent to the time lost by unavoidable delay in the completion of the contract as a result of the Government’s failure to furnish the rights-of-way or easements on time.
^ ‡ $
3.8 COOPERATION AND COLLATERAL WORKS :
The Contractor shall cooperate with all other contractors or workmen concerned with removal or relocation of utilities and shall advise the utility companies concerned directly and in advance of the dates he will require specific utilities removed, relocated or bridged to permit construction or the operation of equipment, and he shall so conduct his operations so as not to un *83 necessarily interfere with the work of such other contractors or delay unnecessarily the re-establishment of such utilities.
8.9 utilities:
*****
(b) Relocation
Unless specifically provided otherwise in contract attachment entitled “¡Special Specifications” or in the detailed plans and/or drawings, all utilities will be relocated, altered, or reconstructed by their respective owners. The Government will conduct or arrange for such negotiations with the owners in respect to such work and the work will be done at no cost to the Contractor. The Contractor will, however, as provided in sub-section 3.8 of these specifications, advise the utility owners concerned directly and in advance of the dates he will require specific utilities removed, relocated, or bridged to permit construction or the operation of equipment.
The temporary relocation or the alteration of any utility, desired by the Contractor solely for his own convenience in the performance of the contract work, to a position or condition other than that provided for in the detailed plans and/or drawings, shall be made at the Contractor’s own responsibility and expense, and he shall make all arrangements with the owners regarding such work.
*****
10. The provisions of the Special Specifications accompanying the contract relevant to removal of utilities and to removal of temporary detours provide as follows:
6. TIME PROVIDED EOR COMPLETION:
In accordance with the provisions of Subsection 3.1 of the Standard Specifications, the Contractor shall complete all work within One Hundred and Sixty-five (165) calendar days after date of receipt of notice to proceed.
Compacted fill type detours at Lassen, Devonshire, and Chatsworth shall be completely removed from the new channel alignment not later than December 1,1955 in order to provide an unobstructed waterway area through the new channel. The bridges at these sites shall be completed to such extent that they can be opened to traffic prior to removal of the detours.
*84 9. UTILITIES:
In addition to the provisions of Subsection 3.9 of the Standard Specifications with regard to utilities, these additional provisions will apply to the work being constructed under this contract.
Existing utilities within the area of improvement and within City street easements are shown on the respective detail bridge plans as well as on the plan profile drawings. The final position of all utilities, both existing and proposed, to be installed in the bridges is indicated on the detail bridge drawings. Existing underground utilities will be temporarily relocated to positions in the detours and, at the proper stage of construction, will be installed in final position on the bridges. Existing overhead utilities will be temporarily relocated insofar as is necessary to facilitate bridge construction.
* * ' * * *
Those utility owners having facilities located within City street easements will arrange for the temporary relocation, and the installation in final position in the bridges and their approaches, of such facilities. The respective utility owners will furnish and place such of their installations, both existing and proposed, as are shown on the plans including hangers, supports, thimbles and other devices that are incidental to the bridge structure for the purpose of supporting or maintaining pipes, wires, conduits, or similar public utility property. The utility owner may arrange with the Contractor to place thimbles, hangers, supports, and similar incidental appurtenances or may place such devices with his own forces.
*****
The Contractor shall advise the respective utility owners directly and in advance of the dates he will require specific utilities removed, temporarily, or. permanently relocated, and/or installed in final position in the bridges and approaches and at the stage of construction which will most readily facilitate the accomplishment of such work.
The Contractor shall make due allowances in his construction schedule for reasonable delays to the work resulting from removal, temporary or permanent relocation, and installation in final position in the bridges and approaches of all utilities and incidental appurtenances indicated on the drawings and/or specified herein.
*****
*85 11. The extent of the defendant’s liability for the delays incident to the removal of interfering utilities, and a determination of whether the defendant discharged its contract duties adequately in connection with the removal of utilities will rest upon the relevant provisions of the contract and specifications, and upon the following chronological series of developments contained in the record:
(a) On January 26,1955, the defendant’s project engineer sent to the Department of Water and Power (DWP) preliminary plans for the Bull Creek No. 3 project, which it anticipated would begin in June 1955, and requested immediate advice as to whether the plans correctly showed the location of interfering utilities.
(b) On April 19, 1955, the District agreed with SCS to furnish the rights-of-way for the channel improvements and bear the cost thereof.
(c) On May 13, 1955, the SCS furnished to all utility companies the project plans.
(d) On June 3, 1955, the plaintiff wrote the following letter to the defendant’s project engineer :
Our firm was apparent low bidder at the public bid opening, for the Bull Creek Flood Channel Improvement, Inv. C.F.-14j held 1:00 P.M. June 2,1955, at your San Fernando, Cahf. office.
Inasmuch as the essence of this, job, as we see it, is completion of bridge and channels, and the removal of detour plugs, before the rainy season and not later than Dec. 1, 1955, we urgently request that the contracting agency take the following actions:
(1) Expedite the preliminary paper work and award this job by telegram not later than June 10,1955.
(2) Order all utility companies to immediately remove their facilities from Lassen, Chatsworth, and Dev-onshire Streets so we can start detour construction. We plan to expedite bridge construction by construction at the three sites simultaneously.
We have the equipment, personnel and materials ready to move in on the job now. We can, and will, complete the major items of work by Dec. 1, 1955, provided we can start at once on the bridges and progress the work without being delayed by the utilities or other outside agencies.
*86 (e) On June 6,1955, the plaintiff again wrote to the project engineer describing in detail the utilities which required removal.
(f) On June 8 the project engineer wrote the plaintiff in part as follows:
Previous arrangements have been made with the owners of subsurface utilities which interfere with construction at the bridge sites. These utility owners are currently completing their plans for those relocations. The respective owners should be ready to make the necessary relocations by the time your construction on the detour fills has progressed to the point which will permit installation of temporary pipe lines.
Your attention is invited to paragraph 9 of the Special Specifications and to Subsections 3.8 and 3.9 of the Standard Specifications with regard to utility reloca-tions. The Government will make the necessary arrangements for the relocation of utilities, but it is the responsibility of the contractor to advise the respective utility owners concerned directly and in advance of the dates he will require specific utilities removed or relocated to permit construction or the operation of equipment.
(g) On June 10,1955, DWP wrote to the District in part as follows:
To date, this Department has received no correspondence from the Los Angeles County Flood Control District regarding reimbursement for system adjustments to be made to accommodate channel improvement.
Please initiate an agreement between the Flood Control District and this Department covering reimbursement for water system adjustments, thereby avoiding delay in channel construction.
(h) On June 13,1955, the plaintiff asked the project engineer to furnish him with a list of the names and addresses of the various utility companies so that they could be notified. The defendant furnished such a list to the plaintiff on June 16.
(i) On June 13 the Flood Control District informed the defendant’s project engineer that the District had not been able to come to an agreement with the DWP as to who should pay for the cost of removing the utilities.
*87 (j) On June 17, 1955, the plaintiff notified DWP that it was starting work on June 20 and that the utilities should be cleared from the construction areas by July 1,1955.
(k) On June 21 the plaintiff requested the defendant to take legal steps to compel DWP to remove the interfering utilities. The plaintiff had been informed that DWP would not take any action to remove the utilities until an eviction notice was served on it.
(l) About June 21 the DWP indicated its readiness to proceed to make the relocations.
(m) On June 22 the District advised the defendant that it had complied with the latter’s instruction of June 7 to notify the utility companies to make the necessary relocations. These notices had been mailed to the utilities on June 17.
(n) On June 23,1955, the defendant advised plaintiff that DWP was preparing work orders for the utility relocations and that its plans were essentially complete. The defendant also advised as follows:
Please be advised, however, that the Department of Water & Power — Water Systems is not being required to “immediately remove its water mains and services from the Lassen, Devonshire, and Ohatsworth bridge sites.” As provided in Paragraph 9 of the Special Specifications for the subject project existing underground utilities will be temporarily relocated to positions in the detours and, at the proper stage of construction, will be installed in final position on the bridges. Installation of temporary facilities in the detours will be accomplished after rough grading of the detours has been completed and prior to the preparation of subgrade for the detour pavement. It is your responsibility to advise the respective utility owners of the specific dates when your work will have progressed to the proper stage of construction which will most readily facilitate the temporary or permanent relocation of their utilities.
For further information on this subject your attention is respectfully invited to Paragraphs 8 and 9 of the Special Specifications for the project and to Subsections 3.8 and 3.9 of the Standard Specifications.
(o) On June 29 DWP informed the defendant that it would place the water lines in the detours starting about July 5 or 6 at the Lassen Street bridge site. But DWP did not show up at that time and instead told defendant that the *88 water lines would not be relocated until a formal agreement as to the cost had been entered into between the utility company and the District.
(p) On July 12,1955, plaintiff wrote to SCS complaining about the utility delays which he said prevented him from proceeding with construction of the detours and bridges. The letter made the following alternate proposals:
There are, as I see it, two solutions to this dilemma. One, allow the contractor to complete detour construction at all sites. This will take about ten days. Assuming your agency can require the utilities to move in that time, let them cut a portion of the detour pavement or the detour sidewalk, under traffic, and place their temporary water mains. The contractor can replace the pavement or sidewalk at a nominal cost under a force account change order. Two, issue a change order to the contract authorizing the contractor to proceed with detour and bridge construction operations on an overtime and/or two shift basis after the water mains are relocated with the government underwriting the additional cost thereof.
Either of the above methods are acceptable to me. However, I favor the first as it is cheaper and simpler.
On July 18 the defendant’s project engineer recommended plaintiff to suspend work on the bridges for the time being and to concentrate all efforts on the channel.
(q) On August 1, 1955, the defendant’s project engineer wrote the following memorandum reflecting the results of a conference with the plaintiff on that date:
I met this date with W. F. Maxwell and Paul Tilker to discuss the subject delays. I advised Mr. Maxwell that the arrangements for utility relocations should be completed by the first part of next week (see my memo to C. W. Thomas dated Aug. 1). Mr. Maxwell advised that as far as he was concerned, it was imperative that he be permitted to proceed with construction at the sites of the Lassen, Dovenshire, and Chatsworth Street bridges immediately. He had originally proposed that a change order be processed for him to accomplish the utility relocation work with his own forces or by subcontract. We advised that this was impossible since a permit to do this could not be obtained from the Department of Water and Power — Water Systems. He had also previously proposed that the job be shut down *89 completely until such time as the relocations had-been accomplished and that he then be given a change order to provide extra compensation for working extra shifts on overtime to complete the project by the scheduled completion time. It was agreed that this procedure was impractical.
Mr. Maxwell therefore proposed that a change order be processed to provide extra compensation and permit him to go ahead with construction work at the bridge sites with the water system facilities in their existing locations. He proposed to proceed with channel excavation and compacted fill, pile driving operations, and bridge concrete using such alternate construction methods as might be necessary in working around the pipelines and providing adequate support for the existing utilities. Mr. Maxwell proposed a price of $4,508 for this extra work.
Paul Tilker and I phoned Hal Enderlin and Earl Neal to discuss this proposal. It was agreed that Service funds could not be used for payment for this extra work since the delay was a result of the local cooperating agency’s inability to furnish rights-of-way usable for construction. This proposed change order would therefore have to be charged to the Flood Control District as Work “B” and would, of course, under the terms of our agreement with the District have to be concurred in by them before we could approve a change order. I advised Enderlin and Neal of the current status of the negotiations between the District and the Department of Water and Power relative to utility relocations (see my memo to Thomas of August 1) and that in view of the fact that a settlement seemed possible at an early date, the Flood Control District had indicated that they would not concur in such a change order unless their proposal for the Department of Water and Power did not work out.
It was agreed, however, that in order to document the fact that the Service was doing everything in its power to find a solution to this problem, a change order for this extra work should be prepared and submitted to the District requesting that by August 9, 1955 either arrangements for water system relocations be completed or the District concur in this proposed change order. This change order will be prepared as Change Order No. 7.
I neglected to advise Enderlin and Neal of a further possible difficulty in obtaining the District’s approval on such a change. Neither did I discuss this with Paul *90 Tilker. While the District might agree to assuming cost of this extra work they would undoubtedly try to force the utility company to pay for any extra charges involved as a result of delays in making the necessary relocations. For this reason the District would probably prefer to have the Contractor submit a claim for damages including possible storm damages at a later date as a result of this delay. In their opinion they would have a better chance of collecting the amount of the claim, if .allowed, from the utility company than they would have in attempting to collect the amount of the change order which would simply be an effort to proceed with the work and avoid possible flood damages.
(r) On August 3, 1955, the defendant’s project engineer wrote the following letter to the District:
Work on the subject contract at the sites of the Lassen, Devonshire, and Chatsworth Street bridges has been materially delayed since July 5, 1955 as a result of the Department of Water and Power’s failure to relocate water system facilities to temporary positions in the street detours. We understand that the reasons for this delay are the result of a controversy between the District and the Department of Water and Power relative to the matter of financing the necessary water system adjustments. We further understand that it is possible that the District and Department of Water and Power may reach an agreement on this matter by August 4 or August 9, 1955, in which case the Department of Water and Power would proceed immediately with the necessary field relocations. The actual field relocations will undoubtedly require at least one or two weeks so that much further delay is apparently inevitable.
The Service has discussed this matter frequently during recent weeks with representatives of the District. The Service, however, feels that every effort should be made to proceed with the work without further delay. Any claim for damages allowed the Contractor as a result of this delay would be charged to the District since it is the District’s responsibility to furnish rights-of-way for these cooperative projects and assume all costs incidental thereto.
In' an attempt to avoid the possibility of a claim by the Contractor, it is proposed to permit him to proceed with construction at the three bridge sites using such alternate construction methods as may be necessary to work around the pipelines in their existing positions. *91 In proceeding in this manner the Contractor should be entitled to extra compensation for the additional work required. Change Order No. 7 covering this proposal is attached for your review and approval. The extra cost as a result of this change will be charged to Work “B” and paid for in total by the District.
Work at Lassen and Devonshire Streets can be completed with water system facilities in their present positions without excessive revision of the original bridge plants. At Chatsworth Street, however, if it is not possible to relocate that water line at the time pile driving operations have been completed, it will be necessary to revise the bridge and possibly the street approach plans in order to permit construction to progress with the water line in its present position.
If arrangements for water system facility relocations cannot be completed by August 9, 1955, it is requested that the District advise this office immediately thereafter of its approval of this proposed change and furnish the necessary plans for revisions to the bridge and approach work at Chatsworth Street. Yerbal approval by phone will be appreciated to be followed by a letter of confirmation.
(s) On September 8,1955, the defendant notified plaintiff that temporary relocation of utilities had been completed as of August 30,1955, and requested the plaintiff to furnish a complete construction schedule showing in detail the proposed schedule of operations. The parties seem to agree that the relocation of utilities had been commenced August 9 and by August 25 had been completed to a point where they no longer constituted an interference to the plaintiff.
12. On January 6,1956, by Change Order 13, the defendant granted a 44-day time extension “as a result of the Government’s failure to complete arrangements for the relocation of utilities in time to avoid serious interference to the work.” The facts concerning the delay are summarized as follows in the statement accompanying the change order:
All known utilities which exist within the limits of the work have been shown on the contract plans. Certain of these utilities, in the positions which they occupied prior to the start of construction, interfered with the removal of existing structures and with the construction of the bridges and approaches at Lassen, Devonshire, and Chatsworth Streets * * *.
*92 By July 5, 1955 tie Contractor had completed sufficient work at the Lassen Street detour to permit the temporary relocation of water system utilities into the detour fill and the subsequent removal of existing facilities from the site of the Lassen Street Bridge. Meanwhile arrangements had been made with field crews of the City of Los Angeles Department of Water and Power to begin the relocation work on July 5, 1955. When the Department of Water and Power field crews failed to show up to perform the relocation work, subsequent investigation showed that the work had not been authorized by the Department of Water and Power since agreements relative to the financing of the work between that Department and local cooperating agencies had not been completed. Arrangements for relocation of water system facilities were subsequently completed by the Department of Water and Power and local cooperating agencies and relocation work begun at the Lassen Street Bridge site on August 9,1955.
During the period from July 5 to August 9 the Contractor was prevented from proceeding with certain key items of work except in a minor way and in an extremely inefficient manner. By working around existing utilities he was able to complete structure removals and to partially complete pile driving at the site of the Lassen Street Bridge. By August 9 structure removals had also been completed at the site of the Chatsworth Street Bridge and the site was ready for pile driving operations to begin, the detour fill at that site having previously been completed sufficiently to permit temporary relocation of utilities.
Temporary utility relocations were completed at the Lassen and Chatsworth Street Bridge sites by August 25, 1955 and. thereafter the Contractor was able to proceeu without interference from existing utilities. Utility re-locations were accomplished at the site of the Devonshire Street Bridge without delay to the work.
Paragraph 9 of the Special Specifications provides that the Contractor shall make due allowances for reasonable delays to the work resulting from relocation of utilities. The delay from July 5 to August 9 is considerably in excess of a “reasonable” delay. Actual delay to the work as a result of the Government’s failure to secure relocation of utilities on time extended even beyond the August 9 date since by that time the Contractor had both the Lassen and Chatsworth Street Bridge sites ready to begin full scale operations and was unable to do so since existing utilities interfered.
*93 The planned sequence of operations was to begin work at the Lassen Street Bridge immediately upon the completion of temporary utility relocations. Had the Department of Water and Power begun the necessary work on July 5 as originally scheduled it would normally have been completed by July 12, a due allowance for reasonable delay. Utility relocations at Chatsworth Street would then normally have been accomplished while pile driving was being completed at Lassen Street and the Contractor could then have proceeded with work at Chatsworth Street without further interference. Making due allowance for reasonable delay for temporary relocation of utilities the Contractor should normally have been able to proceed without interference on July 12, 1955. Actually he was not able to proceed without interference until August 25, 1955. This delay in relocating utilities is therefore considered to have resulted in a delay to the work of 44 calendar days.
During the period of delay for which this extension of time is granted the Contractor was able to proceed without interference with all items of channel work on channel reaches between the bridge sites. However, the time required for work to be done at the bridge sites on bridges, approaches, and channel reaches under the bridges is the governing factor in determining time required for completion of the contract. Channel work in channel reaches between bridge sites would normally be accomplished simultaneously with bridge and approach construction.
‡ ^ ‡ ^ $
The plaintiff signed his acceptance of Change Order 13 on January 13,1956.
13. (a) The contract did not dictate the sequence of work to be employed by the contractor. The plaintiff did not furnish the defendant with a proposed progress schedule within 20 days after receipt of the notice to proceed, as required by section 2.3 of the Standard Specifications. During that period the utilities were not removed as they should have been, and the uncertainty as to when this would be accomplished justified the plaintiff’s failure to furnish a progress schedule, since his plans hinged on the utility removal.
(b) Plaintiff’s original plan had been to complete the bridges first, next the channel excavation, then the concrete invert which lined the bottom of the channel, and finally *94 the paving of the channel slopes. (The contract also required work on the Granada channel which emptied into the Bull Creek channel below Lassen Street, but this is not particularly involved in the suit.) The excavation and paving of the channel was to commence at the south end of the project. The 3 compacted earth detours were to be completed by July 1 so that the water mains could be transplanted there from the road dip at Lassen Street and from the culvert and bridge to be demolished at Devonshire and Chatsworth Streets. Drainage pipes were to be inserted under the detours flush with the bottom of the channel to permit the passage of water down the channel, should there be any. The 3 new bridges at Lassen, Devonshire and Chatsworth Streets, in that order, were to be started on July 1, July 15 and August 1, respectively, and were to be completed on August 15, August 31, and September 15. The respective temporary detours serving each bridge site were to be removed 15 days after completion of the adjacent bridge, during which 15 days the road approaches could be completed so that the bridge could be reopened for traffic. Concurrently the entire channel was to be excavated and graded, starting at the south end, and the paving of the concrete invert at the bottom of the channel was to commence August 31 at the south end of the project and proceed northward. The paving of the slopes was to be started at the south end of the channel on September 15, after the concrete invert had hardened sufficiently to bear the weight of vehicles used in grading and paving the slopes. The pouring of concrete for the inverts was to precede the paving of the slopes by about 15 to 25 days throughout the channel’s length, so that it was planned to complete the concrete invert up to Lassen, Devonshire, and Chatsworth Streets, in that order, by September 15, October 1, and October 15; while the slope paving was to be completed at the same locations by October 5, October 25, and November 20. Thus the schedule called for completing each bridge about one month prior to the concrete invert reaching that point. The final stage of this plan was to complete the gunite (i.e., sand and gravel mixture applied with a gun) surfacing of the slopes under all 3 bridges, and to clean up the job, during the period from November 20 to December 1, by which latter date
*95 the contract called for the job to be fully protected against damage from rains. Storm sewers were to be installed in connection with the construction of the bridges, and their outlets into the channel were to have been in operable condition prior to the prospective onset of the rains. The bridge approaches were to be completed after the completion of the bridges themselves. Cutoff walls were provided by the plans to be installed at intervals underneath the channel paving on the bottom and slopes, and at right angles to, those paved surfaces, their purpose being to check the progress of subsurface erosion should water enter through unpaved sections of the channel prior to its completion, such as in those short sections of the slopes beneath the bridges which were not to be gunited until the 10-day period commencing November 20. Cutoff walls were effective for this purpose in the event of moderate rains, but they would not prevent subsurface erosion in the event a deluge occurred and the water was able to enter through an open area above the cutoff. The plaintiff’s plan did not contemplate that each phase was to be performed to the exclusion of the other phases, but for a correlation of the phases so that detours, bridgebuilding, excavation, and channel paving would proceed in orderly, overlapping waves as the work progressed from south to north.
(c) It was conceded by the defendant’s project engineer that, had the contract been awarded 2 months earlier than it was, the plaintiff’s original plan of performance would have been the most efficient method to follow, but that since the notice to proceed did not issue until June 28 and the rainy season might start in mid-October, he thought it would have been more advisable to have concentrated on completing the channel before completing the bridges so as to better assure the project against damage from heavy rains. On June 3 the plaintiff had advised the defendant that he planned to proceed first with the bridges, and to coordinate the paving of the channel as soon as the bridges were substantially completed. On or about July 13, when the utilities delay made it apparent that the plaintiff’s plan was blocked, the defendant’s project engineer suggested to the plaintiff the advisability of expediting the channel paving between the *96 bridges so as to make the project immune from damage from the forthcoming rainy season. The plaintiff insisted on proceeding along the lines of his original plan, which he stated in effect was his prerogative. His insistence was predicated in part upon the facts set forth in the following findings 14 and 15.
14. In 1953-54 another reach of Bull Creek had been the subject of a flood control construction project known as Bull Creek No. 1, as distinct from the instant contract which is known as Bull Creek No. 3. The plaintiffs constructed the entire channel for Bull Creek No. 1 from May or June 1953 and finished in early November 1953, several months ahead of schedule. Another contractor had the contract for the bridges in that project and he commenced bridge construction just before the plaintiff completed the channel work, and finished the bridges in the first quarter of 1954. After the channel had been completed and while the bridges were being built during the wet season, heavy rains substantially damaged the paved channel between the bridges, and this experience led to design changes which were incorporated into subsequent flood control projects known as Bull Creek Nos. 2 and 3. The essential lesson drawn by plaintiff from the experience as to Bull Creek No. 1 was the advisability from an engineering standpoint of building the bridges along with the channel in a coordinated procedure, “buttoning up” as it went along. There was no problem with removing interfering water mains in the Bull Creek No. 1 job, since there were none. It was not good engineering practice to leave gaps in the paved channel for the construction of bridges as was done in Bull Creek No. 1, for the project thereby remained vulnerable to damage from heavy rains, even if cutoff walls were provided as in the contract in suit.
15. Between the completion of the Bull Creek No. 1 project and the commencement of the instant Bull Creek No. 3 project, Bull Creek No. 2 project was performed by a contractor other than the plaintiff. The Commissioner sustained the defendant’s objection to questioning by the plaintiff on the subject of the Bull Creek No. 2 job on the grounds of irrelevancy, but permitted an offer of proof which is in the *97 record at pages 27 and 28 of the transcript. The defendant conceded that the contractor in Bull Creek No. 2 was delayed by a delay in removing utilities from the bridges, but denied that the Government was responsible for the delay. The plaintiff relies on the facts of record concerning the projects known as Bull Creek Nos. 1 and 2 to establish that the Government’s experience in those instances indicated the advisability of the plaintiff’s original plan of work sequence in the instant contract, and forewarned the Government of the need for timely removal of interfering utility installations.
16. The statement accompanying Change Order 13, quoted at length in finding 12, supra, describes the manner in which the delay in removing utilities interfered with the plaintiff’s pursuit of his original plan of construction sequence as far as the bridgebuilding phase was concerned. In view of the frustration of his original plan, it must now be determined whether the plaintiff exercised reasonable resourcefulness and diligence in proceeding wth the contract under a work sequence revised to accommodate altered conditions brought about by the utility delay and other factors which will appear.
17. Up to August 25, which marked the end of the period of delay in removing the utilities, the following stages of completion had been reached in the contract items as designated :
(a) Clearing and grubbing of site. Completed August 17.
(b) Channel excavation cmd grading. Excavation had proceeded simultaneously below Lassen Street, between Lassen and Devonshire Streets, and between Devonshire and Chatsworth Streets. By August 25 about 86 percent of the channel excavation had been completed (not including grading) , and the areas not excavated consisted principally of the short length above Chatsworth Street and the detour and bridge sites, which occupied collectively about 7 percent of the total channel length. Below Lassen Street the excavation and grading of the channel slopes and bottom had been completed. Between Lassen and Devonshire Streets the excavation was complete but there had been very little grading done. Between Devonshire and Chatsworth Streets the excavation was 5 days short of being completed, and there *98 had been no grading. Above Chatsworth Street there had as yet been no excavation.
(c) Detow construction. The temporary compacted earth detours at Lassen, Devonshire, and Chatsworth Streets had been commenced on June 24, July 6, and July 6, respectively, and they were opened for traffic on July 25, August 25, and July 25, in the same order. The Lassen Street detour had been ready and waiting for the relocation of the water main since July 8.
(d) Removal of old street crossings and bridges. The paved road dip where Lassen Street crossed the channel was broken up from July 25 to August 2. The demolition was hindered because the plaintiff had to work around the water main which lay along the downstream side of the paved road dip. The timber bridge at Chatsworth Street was removed from July 11 to August 18, and this too was hindered by the existence of the water main in place. The removal of the concrete culvert which constituted the crossing of the channel at Devonshire Street commenced on August 25, the water main which was embedded in the culvert not having been fully removed until August 80.
(e) Bridge construction. By August 25 pile-driving had been in progress at the Lassen and Chatsworth Streets bridges for about 2 weeks, and the work had been hindered by the existence of the utilities. As stated by the defendant’s pro j ect engineer, in doing this work the plaintiff was “required to do it in a maimer in which he would not have used had they [the water mains] been relocated.” No start had been made on the Devonshire Street bridge construction by August 25.
(f) Granada traiming wall. By August 17 the concrete base and wall had been poured.
(g) Ohamnel linmg. No gravel blanket had been laid in the bottom of the channel by August 25 and necessarily no concrete invert had been poured. Nor had any channel slopes been paved.
18. Delay in removing the utilities delayed the construction of the Lassen and Chatsworth Streets bridges about 44 days. This is borne out by Change Order 18 granting a 44-day extension. Had the utilities been removed by July 12, as they should have been, a reconstruction of the plain *99 tiff’s probable work progress demonstrates that the Lassen Street bridge would have been completed by September 16 and the approaches would have been completed and the bridge opened to traffic by October 1. Comparably, the Chatsworth Street bridge would have been completed by October 1 and, assuming the availability of concrete, the approaches would have been completed and the bridge opened to traffic by October 16. As to the Devonshire Street bridge the plaintiff took 83 days to remove the existing concrete culvert without any obstructing circumstances visible in the record. It is thus concluded that, had the utilities been removed from the concrete culvert at Devonshire Street by July 12 as they should have been, the new bridge there would have been commenced September 27 and, assuming the availability of concrete, it would have been complete about November 10 and opened to traffic with the approaches completed by November 25.
19. Delay in removing the utilities from the facilities where the 3 streets crossed the channel should have had little or no effect on the progress of excavating, grading and paving the channel. The road dip, concrete culvert, and timber bridge crossing the channel at Lassen, Devonshire, and Chatsworth Streets, together with the 3 detours next to each of these sites, collectively occupied about 7 percent of the total length of the channel. The reaches of the channel not occupied by these crossings and. detours were of sufficient length to have accommodated the equipment and work forces of the excavation and grading subcontractor without loss of efficiency. Even if the utilities had been removed on time, the work of excavation and grading would have had to proceed with obstructions at each road crossing in the shape of a detour and, next to it, piling and other operations in connection with each of the 3 new bridges. At no one time would the entire length of the channel have been free from obstructions so that excavating, grading, and paving could have proceeded in uninterrupted sequence without having to leapfrog obstacles. As it was, the inspection reports indicate that the subcontractor did not do his excavation in a systematic south-to-north sequence, even in those unimpeded reaches of the channel where there was seemingly nothing to prevent it. *100 For example, his first excavation was started at a point halfway between Lassen and Devonshire Streets instead of starting at the beginning of the channel reach between Lassen and Devonshire and going northward. Of course, in contracts of this magnitude there are often local circumstances, not visible in the printed record, dictating minor deviations from the planned sequence.
20. (a) The excavation and fine-grading of the southernmost reach of the channel up to Lassen Street was interfered with by work required under Change Order 6. Change Order 6 required the building of a concrete training wall some 85 feet in length at the conjunction of Granada and Bull Creek channels, which was about 675 feet north of the start of the project. The Change Order also involved changes in alignment and section of the 2 channels for about 137 feet in Bull Creek channel starting at the point of confluence. The Change Order denominated the work to be done as a change in the character of the original contract, estimated that the entire changes would take 15 working days to complete, and granted a contract time extension of 19 calendar days, 4 days of which were because the extra work would “result in extending the work further into the rainy season” when working conditions would be less efficient. General Provision 3 of the contract relating to changes provides:
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change. * * *
The plaintiff signed his acceptance of Change Order 6 on August 15. The defendant’s project engineer had advised the plaintiff on June 4 of the prospective change in plans, without providing working details. On August 16, 1955, the plaintiff wrote to the project engineer complaining of *101 certain delays in the job, including Change Order 6, claiming that it interfered with channel excavation, and claiming also that the defendant had delayed in staking out grades in the channel in the vicinity of the proposed training wall which further delayed the plaintiff.
(b) The plaintiff commenced work under Change Order 6 on Thursday, August 11, 1955. Fifteen working days from then, or on August 31, the work under the Change Order should have been finished. The work on the training wall proceeded with diligence and forms were stripped from the completed wall on August 22. The last item in the Change Order involving the installation of filter material (presumably in the channel) was therefore not completed until September 20, apparently without fault on plaintiff’s part.
(c) The 137-foot stretch of channel whose completion under the Change Order was not fully accomplished until September 20 occurred in about the center of the length of channel between the south end of the channel and Lassen Street. The subcontractor had completed his excavation of the channel up to Lassen Street by the time work commenced on Change Order 6 on August 11, and had fine-graded the channel most of the distance up to Lassen Street. Between August 11 and 27, while the Granada training wall was being constructed and the adjacent area was therefore not available for grading and laying a gravel blanket at the bottom of the channel to receive the concrete invert, the subcontractor did uo further channel work below Lassen Street but diverted his forces to completing excavation between Lassen and Devonshire Streets and to completing most of the excavation between Devonshire and Chatsworth Streets. What he lost in time below Lassen Street on account of the work under Change Order 6 he should have gained in the excavation of the channel in reaches north of Lassen and Devonshire Streets, at least up to the end of August. The diversion of the subcontractor’s forces and equipment to unimpeded stretches of the channel was a sensible accommodation to existing conditions, even though it did disrupt and interfere with the intended and theoretically more logical plan to complete the channel work first from the south end up to Lassen Street *102 and thence to progress up the channel northwards reach by-reach. It was conceded by defendant’s witnesses that the coarse excavation operations in the channel were efficiently performed by the subcontractor. Further observations on the ultimate effect of the delay caused the subcontractor in his work below Lassen Street because of Change Order 6 will be made in finding 22, infra, which describes the status of contract performance by October 3,1955.
21. On September 26 the plaintiff wrote as follows to the defendant:
Kef erring to our letter of June 3, we stated we planned to complete our work so as to clear the channel by Dec. 1, 1955. In spite of pushing, as best we could, through and around utilities which blocked every street intersection, and the clearance of which was not completed until Aug. 30, 1955, it is impossible to clear the channel as planned. If the contracting agency can secure reasonable cooperation from the utilities replacing their facilities we will do everything possible to beat the attached construction schedule. We have allowed five calendar days to replace utilities at each bridge.
The construction schedule attached to the foregoing letter provided as follows:
1. Delay: Non-Removal of Utili-ties_ June 2 to Aug. 30,1955.
2. Lassen St. Bridge_ Aug. 8 to Sept. 28,1955.
3. Chatsworth St. Bridge-August 20 to Oct. 20,1955.
4. Devonshire St. Bridge-Oct. 3 to Dec. 3,1955.
5. Granada Channel (Gunite)_ Sept. 21 to Oct. 10,1955.
6. Street Paving Lassen St_ Complete Oct. 15,1955.
7. Street Paving Chatsworth_ Complete Nov. 10,1955.
8. Street Paving Devonshire_ Complete Dee. 25,1955.
9. Detour Removal Lassen St-Complete Oct. 22,1955.
10. Detour Removal Chatsworth St_ Complete Nov. 17,1955.
11. Detour Removal Devonshire St-Complete Dec. 31,1955.
12. Concrete Channel Invert_ Sept. 15 to Oct. 30,1955.
13. Asphaltic Channel Lining_ Oct. 10 to Nov. 20,1955.
14. Channel Completions at Bridges and Detours:
Lassen St_ Complete Nov. 5,1955.
Chatsworth St_ Complete Dec. 1,1955.
Devonshire St_ Complete Jan. 15,1956.
15. Finish and Cleanup_ Complete Jan. 30,1956.
22. Certain of the items of work specified in the foregoing construction schedule had reached the following stages of completion by October 3,1955:
(a) Lassen Street bridge. Deck poured September 8.
*103 (b) Ohatsworth, Street bridge. The pier wall had been poured September 20. Falsework was completed October 3 and there remained the preparation of the deck for pouring.
(c) Devonshire Street bridge. Kemoval of the old concrete culvert had been completed September 27 and on October 1 the plaintiff was placing fill for slopes and bridge abutments.
(d) Detours. All 3 detours were still in place.
(e) Channel. Excavation and grading had been completed throughout, except for the sections occupied by the detours and bridge sites. Below Lassen Street the gravel blanket and the preparation of most of it with headers and reinforcing steel had been completed in the bottom of the channel, and 1,305 feet of concrete invert had been poured. Between Lassen and Devonshire Streets most of the gravel blanket had been laid and some of it had been graded and installed with headers and reinforcing steel ready for pouring the concrete invert, but no concrete had been poured and there is no way to determine the portions which were ready for the concrete invert to be poured. Between Devon-shire and Ohatsworth Streets no gravel blanket had been laid and, of course, no concrete poured. No slopes had been paved throughout the channel.
23. (a) Had the subcontractor proceeded diligently and efficiently by October 3,1955, the concrete invert should have been poured from the south end of the channel all the way up to the site of the Devonshire Street bridge, leaving a gap for the existing detour and bridge site at Lassen Street. By October 3 the side slopes of the channel in the same distance should have been fine-graded but not paved. This estimate takes into account the delays to the stretch of the channel below Lassen Street caused by the work performed under Change Order 6, which granted the plaintiff a 19-day time extension for performance. The estimate is arrived at as follows:
(b) According to the plaintiff’s original progress plan, as described in finding 13, supra, by October 1 the pouring of the concrete invert was to have been completed up to Devonshire Street, and by October 5 the slope paving was to have been completed up to Lassen Street. The actual status *104 of the channel work up to October 3 has just been described in finding 22, and it falls far short of what had been intended. It has been found previously that the bare excavation of the channel proceeded efficiently, that the 44-day utility delay did not affect the progress of work in the channel, and that the work under Change Order 6 (training wall at the Granada confluence), as well as the Government’s error in staking grades, interfered with channel work below Lassen Street and caused a diversion of the subcontractor’s activity to reaches of the channel north of Lassen Street. To the extent, then, that the channel work was delayed in the first reach up to Lassen Street, it should have been accelerated, or at least kept pace with schedule, in the reaches above Lassen Street. Yet we find that whereas the subcontractor was to have poured concrete from Lassen to Devonshire Streets from September 15 to October 1 under the original schedule, he did not start to fine-grade the channel bottom and slopes until August 6 or to lay gravel until September 26. Similarly, whereas the subcontractor was to have poured the concrete invert from Devonshire Street to Chatsworth Street from October 1 to October 15 under the original schedule, he did not start to fine-grade the channel bottom and slopes until September 24, and as of October 3 he had laid no gravel blanket. There were no known obstructions to the subcontractor from Lassen Street to Chatsworth Street and beyond in prosecuting the channel work. Since he was admittedly diligent in the excavation phases of the channel, he must have been inefficient and unduly slow in the succeeding steps of fine-grading the surfaces, laying the gravel blanket in the channel bottoms, and installing the headers and reinforcing steel in the gravel blanket preparatory to pouring the concrete invert. The daily diary maintained by the subcontractor’s foreman on the job from August 31 onwards discloses clearly that there was continual trouble encountered in laying the gravel blanket and that the work was going slowly.
24. Teamsters' strike. On October 3, 1955, a strike virtually closed down the job until December 13, when the defendant issued Change Order 13 granting the plaintiff a *105 71-day extension of time for contract performance. Change Order 13 described the strike and its effect in these terms:
On October 3,1955 the work was essentially shut down as a result of a strike of the A.F. of L. Teamsters Union against the Southern California Sock Products Association. As a result of this strike the Contractor was unable to obtain from normal sources within the Los Angeles area necessary aggregates for cement concrete, asphaltic concrete, gravel blanket, or gunite. The Teamsters returned to work and aggregates again became available from normal sources on January 3, 1956. On December 13, 1955, Supplemental Agreement No. 12 to Contract No. 12-10-001-41 became effective, this Supplement providing a means for the Contractor to obtain aggregates imported from outside sources with the Government bearing the additional cost thereof. Between October 3, 1955 and December 13, 195'5 only minor amounts of work on key contract items was accomplished. This strike is therefore considered to have resulted in a delay to the work from October 3 to December 13, 1955 or a total of 71 calendar days.
During the course of the strike the plaintiff was able to obtain only small quantities of concrete by paying premium prices to have it hauled in from a distance. With one of the shipments on October 22 he poured 336 feet of concrete invert below Lassen Street which brought the concrete invert intact up to within 639 feet of the Lassen Street bridge. With another shipment on the same day he poured 152 feet of invert at a point in the channel between Lassen and Devon-shire Streets. Apparently he did not use the entire amount of concrete received that day to continue pouring the invert below Lassen Street because at that time all of the gravel blanket below Lassen Street had not been prepared for pouring the concrete invert. With the other shipments of concrete he received during the strike period prior to December 13 the plaintiff poured some piles and the center pier for the Devonshire bridge on October 22 and November 17, respectively, and also poured the concrete deck and 3 catch basins for the Chatsworth bridge on October 15 and November 14, respectively. He completed the approaches to the Lassen and Chatsworth Streets bridges. Also during the strike period the plaintiff managed to secure some gunite material *106 on several occasions, with which he lined the Granada channel, gunited 210 feet of the east slope of the Bull Creek channel below Lassen Street and 192 feet of the opposing west slope. These particular slopes which were gunited were located generally on either side of the channel near the training wall at the confluence of the Granada channel.
25. At the beginning of the strike on October 3 the plaintiff made an urgent request to the defendant to endeavor to secure an emergency status for the job and have the Teamsters’ Union except it from the effect of the strike. There was no program in existence at the time and no formal means available for an official governmental declaration of the job as being of an emergency status and thus immune to strikes, so far as the record discloses. However, the defendant made diligent efforts, without success, to secure the voluntary cooperation of the Union to exempt the project from its strike.
26. The plaintiff was apprehensive that the fall rains would commence at almost any time and would severely damage the incomplete channel. On November 12 he requested the defendant to authorize as extra work temporary improvements to the incomplete bridges so that they could be reopened to traffic and the detours be removed, for he feared the latter would cause an obstruction in the chamiel should there be a heavy rain. This request was not granted.
27. November 14, 1955 rain. The rainy season in the vicinity of the contract site extends from about October 15 to the following April, but heavy rains are not expected until mid-November. At other times in the year there is very little rainfall and conditions during the dry season are ideal for constructing a flood control project of the type in suit. The first rain of the 1955 season started falling on the night of November 13 and continued during the night, totaling about .92 inches. The principal damage to the project was caused by water draining off of Devonshire Street, which eroded and washed away substantial quantities of the unpaved west slope of the channel below Devonshire Street, partially plugged up the earth detours at Lassen and Devon-shire Streets and caused a backup of the debris-filled water, covering the graveled bottom of the channel with a heavy layer of mud and silt for most of the distance between Devon- *107 sbire and Lassen Streets. The eroded areas of the west slope had to be filled in, compacted and regraded where it was washed ont. It will be noted that the slopes from Lassen to Devonshire Streets would not have been paved under the plaintiff’s original progress schedule until October 5-25, and the strike started on October 3. It will also be noted that had it not been for delay in removing utilities, by November 14 the Lassen Street bridge would have been completed and the detour removed. The detour in question served to plug the channel during the rain. A pier footing at Devon-shire Street bridge had to be cleared of mud and silt. Mud and silt had to be removed from about 1,600 feet of gravel blanket between Lassen and Devonshire Streets. This involved removing, cleaning, and replacing or restoring the gravel blanket, removal and reinstallation of headers and reinforcing steel which had been installed in the gravel blanket, and regrading the gravel blanket. The plaintiff did not undertake to repair the storm damage immediately because he felt that until he could obtain a supply of aggregates and gravel it would be inadvisable to clean up and repair the channel, for another heavy rain might come along and require restoration work all over again.
28. (a) In connection with the erosion of the channel slopes below Devonshire Street during the November 14 rain (as well as the even greater erosion during the floods in January 1956 described in finding 35, infra), the plaintiff contends that a major cause of the erosion was the deletion from the original plans of the catch basin and storm sewers at the Devonshire Street bridge, and their substitution by less expensive and less efficient overpour structures. On July 19, 1955, the defendant’s project engineer wrote to the plaintiff confirming a telephone conversation of July 13 announcing that the catch basins and storm drains at Devonshire Street bridge were to be eliminated from the contract. The reason for the deletion was that the State Highway Department, which was obligated to bear the expense of such betterments at this particular bridge because it served a State highway, refused to pay for the more expensive catch basins and storm drains, and required the substitution of a less expensive system consisting of a spillway built into the top of the channel *108 slope which was to carry the runoff from Devonshire Street over the top of the channel and down the side into the channel proper. Such an overpour structure, as it was called, could not be built until the channel slope was paved, whereas catch basins and storm drains were to be built into the bridge and channel at a relatively early stage of construction, such as the catch basins and storm drains at the Lassen and Chatsworth bridges which were incomplete but nevertheless functioning at the time of the November 1955 rainstorm. The catch basin-storm drain type of installation carried the runoff from the adjacent street through a sewer at the curbing and thence through pipes that spilled out into the lower part of the channel.
(b) By the time of the November rain the catch basins and storm drains had been installed at the Lassen and Chats-worth Streets bridges and, while they were not complete, apparently they were sufficiently effective to prevent the bulk of the runoff from spilling over the sides of the unpaved slopes and causing the substantial erosion which occurred below the Devonshire Street bridge. Erosion of soil from the slopes below Devonshire Street covered the graveled bottom of the channel with silt and mud which required removal at considerable expense, as previously described. It is equally true that, had the slopes been fully paved up to Devonshire Street at the time of the November rain, as they probably would not have been even if there had been no strike preventing the delivery of aggregates for concrete, the November rain would not have damaged the gravel channel bottom. It must also be remembered, as stated in finding 23 (a), supra, that with due diligence on the part of plaintiff and his subcontractor, the concrete invert should have been completed up to Devonshire Street by October 3.
29. (a) Article 4(c) of the General Provisions of the contract provided as follows:
5. TERMINATION FOR DEFAULT — DAMAGES FOR DELAY — TIME EXTENSIONS
* * s¡¡ *
(c) The right of the Contractor to proceed shall not be terminated, as provided in paragraph (a) hereof, nor the Contractor charged with liquidated or actual dam *109 ages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors or suppliers due to such causes: Provided, That the Contractor shall within 10 days from the beginning of any such delay, unless the Contracting Officer shall grant a further period of time prior to the date of final settlement of the contract, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the dela,y and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof.
‡ $ * * *
(b) Paragraph 4.8 of the Standard Specification incorporated in the contract provided as follows:
4.S DAMAGE FROM THE ELEMENTS J DIVERSION OF WATER
All damage and loss (whether caused by fire, flood, or any other casualty or happening) to work to be constructed or performed pursuant to the contract (whether or not covered by partial payments made by the Government) shall be at the risk of the Contractor until final acceptance of the work by the Government, and no such damage or loss shall relieve the Contractor of, or in any way affect, his obligations to complete and deliver the work in accordance with the contract requirements, irrespective of any insurance carried by the Contractor.
The Contractor shall assume full responsibility and expenses for removing, protecting and returning to the work site, any and all equipment under his care which might be endangered by said fire, flood, or happening; also, for any interference or delay in operations which might be caused by such incident (s).
Any re-excavation or re-filling made necessary by damage from floods, storms, or water of whatever source or quantity during the course of construction and until *110 final acceptance by the Government, shall be performed by the Contractor at his expense.
* * * * *
(c) Paragraph 12 of the Special Specifications incorporated in the contract provided in part as follows:
12. DAMAGE FROM THE ELEMENTS; DIVERSION OE WATER:
* * * * *
If during the period of this contract any water-borne debris is deposited on the bridge structure, falsework, forms, piers, abutments, wing walls, detour culverts, or other facilities installed by the Contractor, such debris shall be immediately removed from the channel at his expense. The Contractor shall maintain a sufficient number of men and the necessary tools and equipment at the bridge site to insure that the structure and its appurtenances will be maintained free and clear of debris day and night during periods of storm flow in the channel. All materials not in use, which may float or which may divert storm water, shall be removed from the channel each day during the period from October 15 to April 15.
«i» H» í* í*
30. On December 13, 1955, Supplemental Agreement No. 12 was entered into between the parties, providing in pertinent part as follows:
whereas, due to a strike, Contractor has been prevented from obtaining necessary aggregates or concrete in the Los Angeles area to complete the construction of said flood channel, and by reason thereof construction has been delayed until the rainy season, and;
whereas, the Contractor is willing to import needed aggregates from sources outside of the Los Angeles area or from other sources involving an excessive haul distance from the job provided the Government will pay the additional cost of such imported aggregates, and;
* * * *
whereas, Contractor is willing to work double shifts, provided the Government will reimburse him for the added costs of double shifting occasioned by Union rules;
now therefore, in consideratiou of the mutual promises herein contained, the contract is hereby supplemented and modified as follows:
*111 1. The Government, subject to the approval of the Government Representative, as to cost and source, will pay the additional costs of imported aggregates insofar concrete, asphaltic concrete, gunite, gravel blanket and as these aggregates are used in the completion of cement untreated base, included in items 4, 5, 6, 8, 9a, 9b, 9c, 10, 14, 16,19, 24, 25, 26, 27, 28, 30, 81, 37, 38a, 38b, 38c, 38d, under the subject contract.
$ $ $ ‡ ‡
2. When directed by a Government Representative, Contractor will work double shifts. Once double shifting is started, five days notice must be given by the Government to the Contractor to stop the double shifting.
Payment will be made by Government for the extra cost of double shifting and will be limited to the cost of labor paid for by Contractor during any shift but actually not worked by the labor forces. The extra cost of double shifting will include the equitable rental cost of night lighting and related equipment required to work a double shift.
In the event Contractor elects to work more than eight hours in any shift, the Government will not make additional payments to the Contractor for overtime occasioned thereby.
In order to determine extra costs to be paid Government for double shifting Contractor shall make and maintain in duplicate, a daily record of hours of labor for each labor classification and hours night lighting and related equipment is used. Such records will be reviewed, corrected and signed by authorized representatives of Government and Contractor. One copy of the daily record shall be retained by Contractor and the other shall be furnished to Government Representative. $ ‡ $
5. Nothing herein shall be construed to obligate Government to pay Contractor for profit, office expenses, general superintendence, or other general expenses occasioned by work performed under this supplement.
6. Nothing herein shall be construed as a waiver by either party hereto, except as herein specifically provided, of any and all rights to claim of damages arising under this contract.
*112 31. Between the November 14, 1955 rain and the flood of January 25,1956, the following rains were recorded at or near the project site:

Inches

November 17, 1955_ . 12
November 22_ .47
December 1_ . 38
December 2_ . 28
December 4- .38
December 5- . 36
December 6_ . 02
December 23_ . 25
December 25_ .43
December 26- .13
December 27- . 44
The rainfalls enumerated above represented a normal pattern but were sufficient to keep the channel in a damp condition at certain times which made working conditions less efficient but did not cause any physical damage worthy of note.
32. By January 25, 1956, the plaintiff had completed the project to the following extent:
(a) All bridges were complete and the detours removed.
(b) All the concrete invert was completed except for a stretch of 461 feet immediately north of Devonshire Street.
(c) The east slope of the channel had been paved with asphaltic concrete from the south end up to Lassen Street, but not elsewhere.[1]
(d) All the slopes had been fine-graded up to Devonshire Street.
(e) The overpour structures at Devonshire Street had not been placed, since the slopes had not yet been paved.
33. (a) From December 13, 1955, when concrete again became available to the plaintiff, it became highly imperative to proceed with paving the channel bottom and slopes as rapidly as possible in order to avoid further damage from rains. The plaintiff had performed some minor cleanup chores in the channel prior to December 13, but commencing then both the plaintiff and the subcontractor energetically applied themselves to completing the cleanup and repair work left over from the November 14 rainstorm, which involved extensive fill in eroded areas of the slopes, regrading *113 and compaction of the slopes, cleaning the silt and mud from the gravel blanket in the bottom of the channel, reinstallation of headers and reinforcing steel in the gravel blanket, and regrading of the gravel blanket. Had the concrete invert been poured all the way up to Devonshire Street as it should have been by October 3, 1955, much of the cleanup work in the channel bottom would have been avoided^
(b) By means of putting on additional help and working long hours overtime at premium pay, often under lights after it became dark, from December 16 to January 10, 1956, the plaintiff poured a total of 5,500 linear feet of concrete invert. In other words, about 72 percent of the concrete invert for the entire length of the channel was poured in 25 days, including the cleaning up and grading of the existing gravel blanket and the laying, preparation and grading of additional gravel blanket which had to be done before the concrete invert could be poured. This left unpoured a 461-foot stretch of invert immediately north of Devonshire Street.[2] If prior to October 3, 1955, the subcontractor had displayed equal diligence in preparing those parts of the channel bottom which were available for such activities, undoubtedly by October 3 the concrete invert would have been completed at least to Devonshire Street and perhaps beyond, so that that portion of the work done after December 13 would not have been required. Had it not been for the strike commencing October 3 the concrete invert would undoubtedly have been completed prior to the November 14 rain, if the subcontractor and the plaintiff had operated as efficiently as they did after December 13.
(c) The first asphaltic concrete slope paving was not performed until January 19,1956. It is apparent that the subcontractor concentrated his initial activities after December 13,1955 to completing the concrete invert in concert with the plaintiff. To the extent he was engaged in completing the concrete invert with all available forces, the subcontractor was unable to apply himself to repairing, grading, and paving the channel slopes. This is made apparent by the delay until January 19,1956, before the first slope paving was per *114 formed. If the subcontractor had not been concentrating almost exclusively on the channel bottom after December 13 until the concrete invert was almost completed, it is reasonable to conclude that he would have devoted equal diligence to the repair, grading, and paving of the channel slopes, starting with those slopes opposite the channel reaches where the concrete invert had been in place for some months. The pouring records show that the subcontractor paved the east and west slopes throughout the length of the channel in 41 days after starting on January 19,1956, and this included the delay which he necessarily suffered in repairing the extensive damage to the slopes as a result of the intervening January 25-27 flood. If the subcontractor had started his slope paving on or shortly after December 13,1955, and had maintained a rate of speed comparable to that which he demonstrated after January 19, 1956, and if he had not been engaged otherwise in completing the channel invert, it is concluded that he could have completed most, if not all, of the chamiel slope paving before the January 25-27 flood. That he did not must necessarily be attributable to a lack of diligence in his earlier channel operations between completion of the excavation and commencement of the strike on October 3, and to the strike itself. Under the circumstances it would have been wise for the subcontractor to have engaged an additional crew after December 13 to devote itself exclusively to paving the slopes while regular forces could concentrate on the channel invert. Had this been done the channel should have been virtually immune from storm damage by January 25, 1956. This observation draws strong support from the admission contained in the January 27,1956 daily report by the plaintiff’s job superintendent to the plaintiff.
34. After the November 14 rainstorm the defendant’s project engineer urged the plaintiff to take steps to protect the project against further rains, such as sandbagging the piers of the Devonshire bridge and installing temporarily a large drain pipe on the west slope of the channel below Devonshire Street in such a way as to lead off excess water into the bottom of the channel. The latter suggestion was adopted by the plaintiff prior to the damaging flood of *115 January 25,1956, and the plaintiff also installed sandbags as recommended either before or during the January flood.
35. January 1956 -flood, (a) On January 25 a severe rainstorm commenced. On the first day there was 1.48 inches of rain, on January 26 there was 4.88 inches, and. on January 27 there was .27 inches. On December 6,1955, the plaintiff had laid a large drain pipe down the slope leading from the Devonshire Street bridge into the channel, so as to lead excess runoff into the channel and prevent it from eroding the unpaved slopes. However, during the storm excess water eroded the earth on which the pipe was installed and the pipe broke in half, so it no longer served its designed function. The defendant had urged the plaintiff for some time to place a two-foot wall of sandbags along the top of the channel so as to prevent excess water from entering the channel, but this was not done. The plaintiff did not start placing sandbags until the second day of the flood, and these were placed along the top of the channel below Devonshire Street so as to divert the runoff and direct its entry into the channel at some distance below Devonshire Street. This proved to be ineffectual. The catch basins and storm sewers which were installed and functioning at the Chatsworth and Lassen Streets bridges coped adequately with the runoffs at those locations, and there was only minor damage to the channel and the slopes in those areas, but Devonshire Street had a greater drainage than either Lassen or Chatsworth Streets,
(b) Some damage at Chatsworth and Devonshire Streets was done in the channel by the turbulence of downchannel water as it flowed past the bridge piers. Most of the heavy damage occurred in the substantial erosion of the channel slopes immediately above and below Devonshire Streets. The silt from the eroded banks deposited in the bottom of the channel as deep as 3 feet in some places and raised the level of water in the channel to a height where it cut into the slopes of the channel, widening it is some places to 50 feet instead of a normal 15 feet. Very little of the concrete invert was damaged, but the channel bottom was congested with mud, silt, and debris. The only paved slopes at the time were below Lassen Street and they suffered only minor damage, *116 except that at some points the water draining off of an adjacent subdivision got underneath the top of the slope paving and caused some damage. Undoubtedly much of the damage could have been avoided, if the slopes and bottom through the entire length of the channel had been paved.
(c) The damage to the subcontractor’s operation was far more severe than to the plaintiff’s operation. The plaintiff had to wait until about February 1 for the channel to dry out sufficiently to work in before commencing to clean up the channel and repair the damage. Except for an area extending 400 feet upstream from Devonshire Street, the flood repair work was completed about March 1,1956.
36. On or about April 19,1956, the contract was fully performed, inspected, and accepted. On May 16,1956, the plaintiff executed and filed with the defendant a general release in favor of the defendant, noting an exception in the amount of $57,428, plus $5,000 for certain extra work, or a total exception of $62,428.
37. The subcontract, (a) On June 27, 1955, the plaintiff had entered into an agreement with the partnership known as Hermreck and Easter on a form entitled “Purchase order”, in which Hermreck and Easter were referred to as “Subcontractor” and the plaintiff as “General contractor”. In general, the agreement provided that Hermreck and Easter were to perform all of the excavation, fill, and grading under the contract, lay the gravel blanket in the bottom of the channel, pave the slopes of the channel, construct and remove the detours, and to do other items not material to the instant claim. Section C of the subcontract provided in part as follows:
It is agreed that no payment will be made by the General contractor to the Subcontractor for delays of any nature, or for increases in the cost of the Subcontractor’s work, or for damages, delays, or losses incurred by the Subcontractor from fire, flood, lightning, windstorm, explosion, hail, water, sleet, snow, fog, smog, or from acts contrary to the law or from acts caused by a public enemy or from other acts beyond the immediate control of the General Contractor.
(b) After the November 14 1955 rainstorm the plaintiff agreed orally with Hermreck and Easter that the storm dam *117 age repair work would be performed jointly by botb of them and they would endeavor to recover their costs from the defendant. On May 7, 1956, Hermreek and Easter presented a claim to the plaintiff for $19,950 “due to right of way delays.”
(c) On February 28, 1957, the plaintiff wrote to Herm-reck and Easter informing the latter of its intention to file a claim against the defendant for breach of contract in the amount of $69,884.07, allocating $19,451.21 to Hermreek and Easter and the balance to itself. The plaintiff was to prosecute the claim and any recovery was to be divided between the parties in proportion to the respective shares of each in the total claim.
(d) On April 3,1957, the plaintiff wrote to Hermreek and Easter enclosing a check for $1,514.41 as “final payment in full for all work performed by you on the above project as computed below.” The plaintiff and the subcontractor contended at trial that this payment represented merely payment of the balance due to Hermreek and Easter for the work the latter did in performing contract work, but did not intend to relate to any of the damage items in the present suit.
(e) The plaintiff’s bond on the contract in suit covered all of the work to be performed, whether performed by the plaintiff or by Hermreek and Easter.
38. Administrative proceedings. Pursuant to the usual Disputes clause in the contract, the plaintiff filed a claim dated February 15,1957, for damages in the amount of $69,-834.07. After investigation, on May 15,1958, the contracting officer denied the claim. The plaintiff duly appealed from the contracting officer’s adverse findings to the Secretary of Agriculture, the head of the department concerned. On August 12, 1958, the Board of Contract Appeals of the Department of Agriculture, on the Government’s motion to dismiss, dismissed the plaintiff’s appeal from the adverse ruling of the contracting officer on the grounds that the claim was one for unliquidated damages alleged to have been sustained as a result of breach of contract and therefore, under pertinent regulations (7 C.F.R. 1.101 to 1.106), beyond the jurisdiction of the Board.
*118 DAMAGES
39.The plaintiff claims damages of $65,771.59, of which $46,547.78 is claimed on its own account and $19,223.81 on account of its subcontractor, Hermreck and Easter. The $46,547.78 claimed by plaintiff on its own account is constituted as follows:
(a) Inefficiencies attributable to utility delay from July 5, 1955, through August 25,1955_$13, 048.14
(b) “Mitigating” expenses to protect project against anticipated rains_ 4,973. 64
(e) Uncompensated overtime and premium pay subsequent to December 15,1955_ 1, 925.21
(d) Flood damage- 26,600.79
The foregoing elements of damages claimed by plaintiff on its own account will be analyzed in the following findings 40 through 43. The damages claimed by plaintiff on behalf of its subcontractor, Hermreck and Easter, are analyzed in finding 44.
40. Utility delay damages. The damages to plaintiff during the 44-day delay of defendant in relocating utilities are reasonably calculated to be in the amount of $6,300, consisting of labor inefficiencies totaling $1,700, loss of use of equipment in the amount of $3,400, and overhead in the amount of $1,200. The labor inefficiencies are estimated on the basis of a loss of two-thirds of the cost of services of the plaintiff’s job superintendent during the 44-day period, and a loss of one-fourth in the efficiency of the plaintiff’s labor force during the same period. Excluded from the utility delay damages claimed by plaintiff is an item of $1,600 for rental of pile-driving equipment, because there is no confirmation of this expense in plaintiff’s records.
41. “Mitigating” expenses. During the effective period of the teamsters’ strike from October 3,1955, through December 13,1955, it was stipulated that the plaintiff incurred extra expenses of $4,195.31 in obtaining concrete, asphalt and aggregates from outside the strike-bound area for the purpose of putting the work in a better condition for the rainy season, and expenses of $760.97 for overtime and premium wages to place the said material, or a total of $4,956.28. For reasons cited in finding 23, supra, even if there had been no *119 delay in removing utilities at tbe outset of the contract, it is likely that from October 3, 1955, to December 13, 1955, the plaintiff would have incurred the so-called “mitigating” expenses in order to protect the incomplete and exposed parts of the project from the consequences of the forthcoming rainy season.
42. Overtime and premium labor. It was stipulated that the plaintiff expended $1,925.21 for overtime and premium wages after the execution on December 13, 1955, of Supplemental Agreement No. 12, and that the plaintiff was not compensated for this expenditure. The nature of this overtime and premium labor is described in findings 30 and 33, supra.
43. Flood damage. The plaintiff claims expenses of $26,600.79 for flood protection and repair work which took place substantially between November 14,1955, and February 24,1956. Based upon an examination of plaintiff’s books and records, of defendant’s audit thereof, and upon other facts in the record, it is reasonable to conclude that plaintiff’s expenses which were attributable to flood protection and repair work totaled $6,217.50, consisting of $3,000 in extra labor costs, $1,600 in extra use of equipment owned by plaintiff, $1,250 in rented equipment, and $367.50 in floodlights for nightwork. Much of the plaintiff’s claimed extra expenses were rejected because they were not supported by books and records. Some were rejected because they were included to an unknown extent in the plaintiff’s claim on behalf of the subcontractor, Hermreck and Easter, and because Hermreck and Easter had reimbursed plaintiff for a portion of the expenses advanced by plaintiff. Still other portions of plaintiff’s claim for flood damage were rejected because they involved contract items rather than flood protection or repair. That portion of the plaintiff’s flood damage claim relating to overhead expenses ($9,311.34) during the flood protection and repair period is excluded because it cannot be properly attributed to the defendant beyond the extent to which it is applicable to the utility delay (finding 40, supra).
44. Flood damage claim of Hermrech and Easter. As stated in finding 39, supra, plaintiff claims $19,223.81 flood damage on behalf of its subcontractor, Hermreck and Easter. At trial the total of the subcontractor’s expenses winch its
*120 principal witness identified as flood protection and repair costs amounted to $17,782.89, but the figure was predicated largely upon the witness’ recollection of the expenditure as being connected with flood damage as opposed to contract work, instead of being verifiable in the subcontractor’s books and records, which consisted of time cards, payrolls, rental vouchers, and Government inspectors’ daily reports.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and, therefore, the petition is dismissed.,

 Except for the guntting oí small areas of the slopes below Lassen. Street as reported in finding 24, supra.

 The last concrete invert prior to the January 25 flood was poured on January 10. Why the remaining 461 feet was not poured prior to the flood is not explained.